**Department of Health and Human Services**
**DEPARTMENTAL APPEALS BOARD**
**Appellate Division**

Delta Health Alliance, Inc.
Docket No. A-14-39
Decision No. 2624
March 12, 2015

## DECISION

Delta Health Alliance, Inc. (DHA) appealed the determination of the Health Resources and Services Administration (HRSA) disallowing $990,016 DHA charged to federal funds awarded by HRSA for the period July 1, 2009 through November 30, 2011. During the proceedings before the Board, HRSA stated that it had identified additional unallowable costs for the period in question and increased the disallowance amount to $1,089,052. HRSA Br. dated 10/6/14, at 3-4.

DHA concedes that a total of $13,562.06 was properly disallowed but maintains that the disallowance of the remaining amount should be reversed. DHA Br. at 5; DHA Reply Br. at 3, 18; DHA Ex. 31, line 86.

For the reasons set out below, we reverse the disallowance in the amount of $23,551.23 and uphold the disallowance in the amount of $1,065,500.77, which includes the $13,562.06 DHA concedes is unallowable. In addition, we remand the case to HRSA to obtain input from the Division of Cost Allocation regarding whether DHA's indirect cost rate agreement should be reopened and recalculated to take into account certain legal fees that we find are not properly charged s direct costs.

## Background

DHA is a non-profit organization located in Stoneville, Mississippi. Its mission is to improve the health of residents of Mississippi between the Mississippi and Yazoo rivers (the Delta region) through access to high quality health care, community outreach programs, and educational service. Most of DHA's funding comes from federal sources: the Department of Health and Human Services (HHS), including several HHS operating components in addition to HRSA, the U.S. Department of Education, and the U.S. Department of Agriculture. DHA also receives a small percentage of non-federal funding from foundations and other private sources. DHA Ex. 6, at 2; DHA Ex. 1 (document titled "DHA Accomplishments"). DHA received more than a dozen federal grants over the time period at issue here. DHA Ex. 1.



EXHIBIT
A

HRSA's Office of Rural Health Policy awarded a grant to DHA for a project titled "Delta Health Initiative" (DHI) for a five-year project period beginning July 1, 2006. HRSA Ex. A. Public Law No. 109-149, Title II appropriated funds—

> for carrying out the Medicare rural hospital flexibility grants program under section 1820 of [the Social Security] Act (of which $25,000,000 is for a Delta health initiative Rural Health, Education, and Workforce Infrastructure Demonstration Program which shall solicit and fund proposals from local governments, hospitals, universities, and rural public health-related entities and organizations for research development, educational programs, job training, and construction of public health-related facilities).[1]

Consistent with the statutory authority, DHA describes the purpose of the DHI project as funding "an alliance of providers to address longstanding unmet rural health needs in the Delta (e.g., access to health care, health education, research, job training, capital improvements)" with a goal of "improv[ing] the health of people living in this historically distressed region." DHA Br. at 2.

HRSA awarded DHA $25,289,768 for the DHI project for the budget period July 1, 2009 through June 30, 2010 and a total of $34,174,401 for the remaining budget periods, which began July 1, 2010 and went through September 30, 2012.[2] DHA Ex. 6, at 6. DHA used the DHI grant to fund numerous projects, including the Indianola Promise Community (also referred to in the record as the Delta Promise Community) and Electronic Health Records. *See, e.g.,* DHA Ex. 34, at 44-45.

The award notices for each of the budget periods at issue here state that the award "is subject to the terms and conditions incorporated either directly or by reference in ... 45 CFR Part 74 or 45 CFR Part 92 as applicable." HRSA e-mail dated 1/13/15, attachments. Part 74 contains uniform administrative requirements governing HHS awards to nonprofit organizations like DHA as well as subawards made by the direct recipient of an award. 45 C.F.R. §§ 74.1(a), 74.5(a).[3] Part 74 requires generally that a recipient of federal funds have a financial management system that provides for "[r]ecords that identify adequately the source and application" of funds for grant activities ...." 45 C.F.R. § 74.21(b)(2).

---

[1] The grant award notices identify this provision as the authority for the award.

[2] HRSA made an award for the budget period July 1, 2010 through June 30, 2011 and ultimately extended that budget period through September 30, 2012. HRSA e-mail dated 1/13/15, attached award notices.

[3] Section 74.1(a) of 45 C.F.R. provides that the uniform administrative requirements in Part 74 apply to HHS "grants and agreements" as well as "[s]ubgrants or other subawards awarded by recipients of HHS grants and agreements...." On December 19, 2014, HHS issued an interim final rule that supersedes 45 C.F.R. Part 74. 79 Fed. Reg. 75875. We cite to the provisions of Part 74 in effect when the awards at issue here were made.

Section 74.27 incorporates by reference the cost principles in OMB (Office of Management and Budget) Circular A-122, codified at 2 C.F.R. Part 230 (2005-2013).

The cost principles require that, among other things, costs be: "reasonable for the performance of the award," "allocable" to the award, "accorded consistent treatment," "determined in accordance with generally accepted accounting principles," and "adequately documented." 2 C.F.R. Part 230, App. A, ¶ A.2.a, d, e, g. Paragraph A.4 of Appendix A to Part 230 states in part that a "cost is allocable to a particular cost objective, such as a grant, contract, project, service, or other activity, in accordance with the relative benefits received."

The Board has repeatedly held that "under the applicable regulations and cost principles, a grantee has the burden of documenting the existence and allowability of its expenditures of federal funds." *Suitland Family & Life Dev. Corp.*, DAB No. 2326, at 2 (2010) (citation omitted). "Once a cost is questioned as lacking documentation, the grantee bears the burden to document, with records supported by source documentation, that the costs were actually incurred and represent allowable costs, allocable to the grant." *Northstar Youth Servs., Inc.*, DAB No. 1884, at 5 (2003).

The award notices also contain a standard term stating that "unless otherwise noted" in the award notice, "[a]ll discretionary awards issued by HRSA...are subject to the HHS Grants Policy Statement (HHS GPS)[.]"[4] Another standard term states in part that "[i]n addition to the prior approval requirements identified in [45 C.F.R.] Part 74.25, HRSA requires grantees to seek prior approval for significant rebudgeting of project costs."

HRSA conducted an Incurred Cost Review of the DHI award in December 2011 to determine if costs claimed for the period July 1, 2009 through November 30, 2011 "were allowable, reasonable and allocable under the grant terms and conditions and applicable Federal regulations." DHA Exs. 5, 6, at 2, 8. The review report identified a total of $2,154,670 in unallowable direct costs and associated indirect costs. DHA Ex. 6, at 3; *see also* DHA Ex. 9, at 1. In a March 22, 2013 letter transmitting the report to DHA, HRSA gave DHA an opportunity to provide any "additional documentation in support of the amount owed of $2,154,670 that you would like us to consider as part of the audit resolution process[.]" DHA Ex. 5, at 1. DHA responded on May 15, 2013, providing additional information and documentation to HRSA. DHA Exs. 7, 8. In a letter to DHA dated December 16, 2013, HRSA stated that based on a supplemental review of the DHI

---

[4]  The award notice referred to the 2007 HHS GPS (GPS), which is available at http://www.hhs.gov/grants/grants/policies-regulations/index.html. Neither party identified any provisions in the award notice that deviated from the requirements in that GPS.

4

award conducted on June 4, 2013, it was allowing $933,934 of the costs previously identified as unallowable. DHA Ex. 9, at 1-2. HRSA also stated that the documentation in DHA's May 15, 2013 response supported an additional $230,720 of costs. HRSA further stated that it had determined that DHA "did not…provide sufficient documentation to support the remaining $990,016 in unallowable direct costs and associated indirect costs identified in the [review report]," and that HRSA was therefore requesting a refund in that amount.[5] Id. at 2.

DHA timely appealed to the Board pursuant to 45 C.F.R. Part 16. DHA Ex. 11. The record for this decision includes the briefs filed by the parties pursuant to 45 C.F.R. § 16.8, DHA's Exhibits 1-110, HRSA's Exhibits A-C, the parties' responses to an Order to Develop Record issued by the Presiding Board Member, and DHA's reply to HRSA's response to the Order to Develop Record.[6] DHA filed requests for a hearing and for an oral argument. The Presiding Board Member denied the requests, finding that DHA had not shown that a hearing was warranted under 45 C.F.R. § 16.11(a) and that further development of the record could best be done in writing rather than in an informal conference. Ruling on Requests for Oral Proceedings and Order to Develop Record, dated 2/2/15.

**Analysis**

I.  **DHA's argument that HRSA failed to meet the requirements of 45 C.F.R. § 74.90 has no merit.**

DHA argues as a threshold matter that HRSA's December 16, 2013 letter did not meet the requirements in 45 C.F.R. § 74.90 for a "final decision." DHA Br. at 2, 4-5, 28; see also DHA Ex. 15 (1/16/14 notice of appeal). DHA argues specifically that HRSA issued its final decision before "it [was] clear that the matter cannot be resolved through further exchange of information and views" and that HRSA's final decision did not contain "[e]nough information to enable the recipient to understand the issues and position of the HHS awarding agency." DHA Br. at 5, quoting section 74.90(a) and (c)(2) (emphasis omitted). DHA stated that it was filing its appeal "under protest" because HRSA "failed to issue an appealable 'final decision' as required by section 74.90. Id. at 4 n.3; DHA Ex. 11.

---

[5] The indirect costs were based on DHA's approved indirect cost rate. DHA had a final indirect cost rate of 72% for the period July 1, 2009-June 30, 2010, and a provisional indirect cost rate of 72% from July 1, 2010 until amended. DHA Ex. 110, at 6. The rate applied to all of DHA's federal awards. Id.

[6] HRSA did not request an opportunity to respond to DHA's section 16.8 reply brief. The Board gave HRSA an opportunity to reply to DHA's response to the Order, but HRSA did not file a reply. See Order at 2.

Case: 4:15-cv-00058-JMV Doc #: 1-2 Filed: 05/11/15 5 of 42 PageID #: 12

5

We conclude that HRSA was not required to engage in any further exchanges of information or views with DHA before issuing the disallowance. As indicated above, before issuing its final decision, HRSA issued a report on the results of the Incurred Cost Review and gave DHA an opportunity to provide additional documentation in support of its position. Nothing in section 79.90(c) required HRSA to offer DHA a further opportunity to provide supporting documentation before HRSA issued its final decision.

Moreover, contrary to what DHA implies, HRSA was not required to explain why it found DHA's additional documentation and information insufficient to support the $990,016 disallowed by HRSA's final decision. Instead, HRSA needed only to state the grounds on which it found each of the costs at issue unallowable. HRSA's final decision referred to the review report, which gave a reason for each of the costs identified as unallowable. DHA Ex. 6, Schedule A at 1-27, columns headed "Disallowed Reason," "Comments," and "ORHP Comments." We find that the report to which HRSA's final decision refers provided "[e]nough information to enable DHA to understand HRSA's position." Indeed, DHA's briefing of the issues reflects such an understanding.

In any event, the Board has consistently held that a federal agency may cure any inadequacies in a final decision during the appeal process as long as the recipient has an opportunity to respond. *See Philadelphia Parent Child Ctr.*, DAB No. 2356, at 4 (2010). HRSA elaborated on the basis for the disallowance in its response brief, and DHA had an adequate opportunity to respond by filing its reply brief. DHA also had an adequate opportunity to respond to the disallowance of additional costs identified in HRSA's response brief.

Finally, the Board has previously held that the description of what a final agency decision must include is "not intended to provide sanctions for Agency noncompliance" and "certainly do[es] not offer the remedy of reversing an Agency determination." *Vanderbilt University*, DAB No. 903, at 86 (1987). The provisions of section 74.90 "are clearly intended instead as general guidelines to inform grantees of how the Department's appeal processes operate." *Id.*[7]

Accordingly, we conclude that HRSA's final decision contains sufficient information, especially when taken together with the additional development of the record during this appeal, to provide DHA with a fair opportunity for review.

---

[7] DAB No. 903 cites to section 74.304(e), which was later reorganized and amended as section 74.90 with no substantive changes. The Board's regulations, which have not been amended since 1997, state: "Details of how final decisions are developed and issued, and what must be in them, are contained in 45 CFR 74.304." 45 C.F.R. § 16.3(b).

6

**II.**     <u>**Based on our review of the record, we reverse the disallowance in part and uphold it in part.**</u>

We explain below how we dispose of each of the disputed costs, which we identify using the categories in the parties' submissions. Each category of costs consists of one or more line items (some including multiple costs), which we identify individually where appropriate.[8]

### A. Proposal Costs

DHA charged to the DHI award for budget year 2011 direct costs of $27,575 for payments to external reviewers hired by DHA to assist in evaluating proposals solicited by DHA for projects funded by the DHI award. HRSA disallowed the costs on the ground that proposal costs are allowable only as indirect costs. HRSA Ex. 31. HRSA cites to 45 C.F.R. § 74.27(b)(1), which provides in relevant part:

> Bid and proposal costs are the immediate costs of preparing bids, proposal, and applications for Federal and non-Federal awards, contracts, and other agreements, including the development of scientific, cost, and other data needed to support the bids, proposals, and applications. Bid and proposal costs of the current accounting period are allowable as indirect costs. . . .

HRSA Br. at 7. (The GPS, at II-31, which HRSA also cites, mentions section 74.27(b)(1).) DHA takes the position that the costs at issue are not covered by the quoted provision because they were "were not for *preparing* anything"; rather, the "reviewers were hired to assist DHA in *evaluating* the responses its aspirant sub-grantees submitted to DHA's own requests for proposals for DHI funds." DHA Reply Br. at 3-4 (italics in original); *see also* DHA Reply to HRSA's Response to Order at 1 ("these expenses were not 'the immediate costs of preparing bids'"). According to DHA, moreover, the costs are properly charged as direct costs of the DHI grant because the proposals that were reviewed "related directly to completing a HRSA-approved goal, namely DHI Goal One: 'Provide oversight, administration and support to projects undertaken by our partners,' Objective B: 'Establish and support new partner initiatives including those identified through a competitive RFP [request for proposal] process conducted in the spring 2010.'" DHA Br. at 6.

---

[8] Unless otherwise specified, the disputed line items for each category of costs are those listed in DHA Exhibit 31, which expands the spreadsheet at HRSA Exhibit C (captioned "Final List of Disallowed Costs by DHA Issue") to include additional columns captioned "DHA Response" and "Additional Rebuttal." The pages of DHA Exhibit 31 are unnumbered, but the cost categories and line items in each cost category can be readily located.

Section 74.27(b)(1) applies to the immediate costs of preparing proposals to obtain awards of federal or non-federal funds. The term "award" encompasses a subaward. *See* 45 C.F.R. § 74.1 (quoted in n.3 above). The proposals at issue here were submitted in response to DHA's requests for proposals for subawards under the DHI grant, so the regulation would apply to the immediate costs of preparing these proposals. However, the costs at issue here were not incurred by the prospective subawardees to prepare the proposals. Instead, the costs were incurred by DHA for a contractor to assist it with the evaluation of the proposals. Thus, section 74.27(b)(1), on which HRSA relied in determining that the costs at issue would be allowable only as indirect costs, does not apply here. Moreover, since DHI was carrying out the grant purpose of identifying appropriate projects for subawards when it evaluated the proposals, it is reasonable to charge the costs as direct costs of the DHI grant.

Accordingly, we reverse the disallowance with respect to this cost category.

## B. Budgeting Tool

DHA charged the DHI award for budget year 2011 direct costs of $2,812.50 for consulting to provide DHA with a "budgeting tool to manage projects/budgets[.]" DHA Ex. 31. HRSA disallowed the costs on the ground that they were "not within the scope of DHA's approved project" and thus not allowable as a direct cost of the DHI award. HRSA Br. at 8. DHA asserts that the "budgeting tool assisted with the 'gap analysis,' a requirement of Grant goals and objectives." DHA Reply Br. at 4, citing DHA Ex. 32, at 41.

Direct costs are defined as "those that can be identified specifically with a particular final cost objective, i.e., a particular award, project, service, or other direct activity of an organization." 2 C.F.R. Part 230, App. A, ¶ B.1. Thus, a cost "may be charged as a direct cost of an award 'if it can be specifically identified with that award as a final cost objective.'" *N.E. Louisiana Delta Cmty. Dev. Corp.*, DAB No. 2165, at 7 (2008), quoting *Rio Bravo Ass'n*, DAB No. 1161, at 9 (1990). Indirect costs are "those that have been incurred for common or joint objectives and cannot be readily identified with a particular final cost objective." *Id.* ¶ C.1. Thus, the costs incurred for the budgeting tool are not allowable as direct costs of the DHI award absent a showing by DHA that they can be specifically identified only with that award.

DHA has not made such a showing here. The exhibit on which DHA relies, DHA Exhibit 32, is a program narrative for the period July 1, 2009 through June 30, 2010, and thus is inapplicable to the 2011 budget year to which the costs incurred for the budgeting tool were charged. The program narrative for July 1, 2010 through June 30, 2011, DHA Exhibit 34, identifies "To prepare a gap-analysis based on current data" as an objective of

Goal 2, "To perform analysis of Delta Health Alliance projects in accordance with evidence-based research guidelines." DHA Ex. 34, at 60-61. However, we find nothing in that exhibit that describes the budgeting tool or otherwise indicates that the budgeting tool was designed to be used solely to manage the projects funded by the DHI award.

Accordingly, we uphold the disallowance with respect to this cost category.

### C. Compass Group

DHA charged to the DHI award for budget years 2011-2012 direct costs totaling $69,965 for a contract with the Compass Group. DHA Ex. 31. HRSA disallowed the costs on the ground that they were fundraising costs that are unallowable under 2 C.F.R. Part 230, Appendix B, ¶ 17.a. HRSA Br. at 8-9. That provision states in pertinent part:

> Costs of organized fund raising, including financial campaigns, endowment drives, solicitation of gifts and bequests, and similar expenses incurred solely to raise capital or obtain contributions are unallowable.

DHA argues that the costs were not incurred for fundraising because "no one" at Compass Group "engaged in direct solicitation of contributions (i.e., fundraising)." DHA Br. at 8. According to DHA, Compass Group was hired "to develop fundraising strategies to be employed by DHA...to enable DHI programs to continue after HRSA funding had come to an end." *Id.* at 9-10.

Contrary to what DHA suggests, nothing in the regulation limits "solicitation of gifts and bequests" to "direct" solicitation by an individual. Moreover, "organized fund raising" does not occur in a vacuum but typically requires significant planning and development. DHA has not explained why it would be reasonable to allow federal funds to be used for the planning and development of various types of fundraising activities when using federal funds for implementing the activities is prohibited, and we decline to draw such a distinction. Furthermore, some of the services for which the Compass Group billed could arguably be considered a fundraising activity itself rather than planning and development of such an activity. *See, e.g.,* DHA Ex. 14 (letter from Compass Group stating that it "[a]ssist[ed] in the creation of messaging for fundraising and publications" and "in the identification of potential donors and volunteer leadership.").

DHA argues further that the costs are allowable because they "fall[] squarely" under the approved project goal "Develop a comprehensive business plan for sustainability of DHA core services." DHA Br. at 9. DHA does not specifically identify its "core services" or explain why fundraising was necessary in order to sustain them. In any event, HRSA could not by approving this broad goal authorize the use of federal funds for purposes specifically prohibited by regulation.

Accordingly, we uphold the disallowance with respect to this cost category.

## D. Travel and Telephone Allowances

DHA charged to the DHI award for budget years 2010-2012 direct costs totaling $28,219.85 and associated indirect costs totaling $20,565.18 for travel and telephone allowances paid to certain DHA employees. HRSA disallowed the costs on the ground that DHA did not provide adequate documentation to show that expenditures for travel and telephone were reimbursed consistently among DHA employees as required by 2 C.F.R. Part 230, Appendix C, ¶ 51.a. HRSA Br. at 9. That provision states:

> Travel costs are the expenses for transportation, lodging, subsistence, and related items incurred by employees who are in travel status on official business of the non-profit organization. Such costs may be charged on an actual cost basis, on a per diem or mileage basis in lieu of actual costs incurred, or on a combination of the two, provided the method used is applied to an entire trip and not to selected days of the trip, and results in charges consistent with those normally allowed in like circumstances in the non-profit organization's non-federally-sponsored activities.

DHA argues that it paid the travel allowances to "certain employees who spent considerable portions of their work days traveling" pursuant to DHA's "published and Board-approved policies, which were crafted to align with the spirit" of the cost principles quoted above. DHA Reply Br. at 5-6; DHA Br. at 11. DHA's Policies and Procedures Manual, Employee Practices, Section 2, states, "Select employees may have a travel allowance granted as terns of employment." DHA Ex. 36, at 30. DHA asserts that the amount of the travel allowance received by the eligible, participating employees "was less than the amount they would have received had they maintained an actual record of their travel expenses and filed periodic travel vouchers." DHA Br. at 11. DHA also asserts that it incurred lower costs by paying a telephone allowance of 75% of the monthly charge for a participating employee's personal cellular telephone, or $75, whichever was less, than if it provided a cellular telephone to that employee. *Id.* at 11-12.[9]

DHA essentially admits that it paid the travel costs of certain employees differently from the travel costs of other employees by paying "a travel allowance…as terms of employment" only for certain employees. Regardless of whether this resulted in federal funding sources being charged at a higher rate than non-federal funding sources, we conclude that the travel allowances were unallowable under the regulation on which

---

[9] DHA does not dispute that paragraph 51.a of Appendix C applies to telephone charges, which could be considered expenses for "related items."

10

HRSA relies as the basis for the disallowance. Paragraph 51.a of Appendix C specifies that travel costs "may be charged on an actual cost basis, on a per diem or mileage basis in lieu of actual costs incurred, or on a combination of the two[.]" The travel allowances charged here were not paid on any of these bases. Instead, the travel allowance, as explained by DHA, was an up-front allowance not given for actual trips but as part of an employment contract. In any event, the record does not support DHA's assertion that the amount charged to the DHI awards for the travel allowances was less than if the employees at issue had been reimbursed for their actual travel costs. Indeed, that assertion is undercut by DHA's statement that the amount of the travel allowance was determined based on "the projected travel of the employee[.]" DHA Br. at 11.

DHA also admits that it paid the telephone costs of certain employees differently from the telephone costs of other employees, stating that approvals of applications for telephone allowances "are granted within very specific parameters." DHA Br. at 12. DHA failed to establish that paying the telephone allowances at issue here did not result in federal funding sources being charged at a higher rate than non-federal funding sources. As noted above, DHA argues that the cost of the telephone allowance—75% of a participating employee's monthly cell phone bill not to exceed $75—was less than the monthly cost to it of providing a cell phone for the employee's use while on official travel. However, this is a false comparison since DHA does not allege, much less show, that it provided cell phones to any employees on travel. Further, DHA makes no allegation that the amount of the telephone allowance did not exceed the cost of using a landline phone while on travel. Thus, the telephone allowances were not allowable under the applicable cost principles.

Accordingly, we uphold the disallowance with respect to this cost category.

## F. Community Outreach[10]

DHA charged to the DHI awards for budget years 2010-2012 direct costs totaling $101,889.76 and associated indirect costs totaling $17,768.95 for promotional items, sponsorships, business card printing and miscellaneous other costs, all of which DHA said were incurred for community outreach.[11] DHA Ex. 31. HRSA disallowed the costs pursuant to 2 C.F.R. Part 230, Appendix B, ¶ 1. HRSA Br. at 10. That provision states in pertinent part:

---

[10] DHA's brief notes that cost category E is "Intentionally Left Blank." DHA Br. at 9.

[11] DHA concedes that of this amount, direct costs of $1,045 and associated indirect costs of $752.40 for "sponsorship for fire chiefs" are not allowable. DHA Ex. 31, line 86.

11

d. The only allowable public relations costs are:

＊＊＊＊＊＊

(2) Costs of communicating with the public and press pertaining to specific activities, or accomplishments which result from performance of Federal awards (these costs are considered necessary as part of the outreach effort for the Federal award);

＊＊＊＊＊＊

e. Costs identified in subparagraph[]...d above if incurred for more than one Federal award or for both sponsored work and other work of the non-profit organization, are allowable to the extent that the principles in Appendix A to this part, paragraphs B. ("Direct Costs") and C. ("Indirect Costs") are observed.

The definitions of direct and indirect costs in paragraphs B and C of Appendix A are quoted in our discussion of cost category B above. Consistent with those definitions, the GPS, to which HRSA also cites, provides that the allowable public relations costs described in paragraph d.(2) of the Appendix B "may be treated as direct costs but should be treated as indirect costs if they benefit more than one sponsored agreement or if they benefit the grant and other work of the organization." GPS at II-38.

HRSA found that the costs are issue here—

may have benefitted the DHI grant, but they also benefitted the other work of DHA. As such, these expenses may only be charged to the grant under DHA's indirect cost rate. Therefore, the costs related to public relations activities, totaling $119,685.71, are considered unallowable.

HRSA Br. at 10.[12]

DHA gave only the following response to the basis for the disallowance set out in HRSA's brief:

For the vast majority of the period under review, the [DHI] Grant was DHA's only source of funding for the provision of health services in the region, and DHA had no "other work" unrelated to the goals and objectives of the DHI. Thus, all communications with the public or press during the time period in question were, without qualification, "about specific activities or accomplishments under the

---

[12] If it were charged "under DHA's indirect cost rate," the $101,889.76 at issue here would not be claimed as a direct cost of the DHI grant award. Instead, it would be included in the indirect cost pool used to develop DHA's indirect cost rate and would be distributed to benefitting cost objectives by applying the indirect cost rate to the direct cost base. *See, e.g., Benaroya Research Inst.*, DAB No. 2197, at 2 (2008).

grant –supported activity." HHS Grants Policy Statement at II-37. DHA would be interested to know what "other work" or other "sponsored agreement" HRSA believes was advanced by these expenditures. HRSA provides no indication, let alone evidence, of that in either its brief or its spreadsheet.

DHA Reply Br. at 7.[13]

DHA's argument is not persuasive. As we noted above, a grantee has the burden of documenting the allowability of its expenditures of federal funds. Since a cost must be allocable to a grant award in order to be an allowable cost of that award (2 C.F.R. Part 230, Appendix A, ¶ A.2(a)), a grantee bears the burden of showing that a questioned cost is in fact allocable to the award to which it is charged. Thus, where a grantee with multiple funding sources charges the cost of a particular activity solely to one award, the grantee (not the grantor agency) also has the burden to document that only the award charged benefits from the activity. DHA has not met that burden here. DHA's reference to the "vast majority of the period under review" in the first sentence quoted above in effect acknowledges that for part of the three years at issue here, DHA had programs other than the DHI grant to which the costs at issue might be allocable. In addition, HRSA could reasonably question whether all of the costs at issue were properly allocated to the DHI grant based on the undisputed fact that during the three years at issue, DHA received numerous federal grants in addition to the DHI grant as well as some non-federal funding. *See* DHA Ex. 1; DHA Ex. 6, at 2.

Accordingly, we uphold the disallowance with respect to this cost category.

### G. VISA Expenses

DHA charged to the DHI awards for budget years 2010-2012 direct costs totaling $45,065.56 and associated indirect costs totaling $32,933.62 for travel and other expenses charged by DHA employees to DHA's VISA credit card account.[14] HRSA disallowed the charges for travel on the ground that DHA failed to document that these charges "were incurred towards the sole purpose of meeting the objectives of the DHI award." HRSA Br. at 11. HRSA stated that although DHA had provided documentation that "appear[s] to relate to travel activities that occurred during the time period in question, the documentation does not clearly state a DHI-related purpose." *Id.*, citing DHA Ex. 17.

---

[13] Although DHA cites to the GPS at II-37, the language DHA quotes appears at page II-38 in the GPS currently available on the internet.

[14] These amounts are shown on the parties' respective spreadsheets, which identify the line items in this cost category as 499-506, 510, 512-515, 517, and 519-523. HRSA Ex. C at 7-8; DHA Ex. 31. DHA refers to the same amounts in its reply brief, but its list of disputed line items omits 500-505. DHA Reply Br. at 7. There is no clear explanation of this discrepancy.

DHA does not dispute that, in order for the travel charges to be allowable, the travel must have been for activities funded by the DHI grant. In addition, DHA acknowledges that there were no approved travel vouchers identifying the "business purpose" of the travel at issue here. DHA Reply Br. at 8. DHA nevertheless takes the position that the costs are allowable because its policy in effect since 2008 "allowed pre-approved employees to charge the VISA card for amounts commensurate with their level of authority without follow-up documentation" and because "DHI was the only project of its kind that DHA had at the time the disallowed costs were incurred." *Id.*

DHA's arguments have no merit. As previously stated, a grantee must be able to provide documentation adequate to establish that each cost charged to an award is, in fact, allowable. DHA admits that it allowed employees to charge expenses to DHI awards without submitting any documentation. This, in and of itself, is a sufficient basis for sustaining the disallowance. DHA's allegation that HRSA knew of this policy, even if true, does not relieve DHA of its obligation since HRSA cannot be estopped from disallowing costs not charged in accordance with the clear requirements of the applicable regulations. *See, e.g., Texas Dep't of Human Servs.*, DAB No. 1344, at 5-9 (1992) (federal agency not estopped from disallowing costs where State alleged that agency knew of State policy that resulted in unallowable costs). Moreover, DHA failed to show that the travel costs are allocable solely to the DHI grant. As indicated above, DHA baldly asserted that during the budget period 2010-2012 it had no programs other than DHI to which certain costs might have been related. However, DHA's own exhibit shows multiple funding streams were available during that time period (DHA Exhibit 1), and DHA fails to show that none of these other programs benefited from the travel-related costs. For example, DHA does not even allege that the employees at issue here worked solely on the DHI grant, much less point to any documentation to support such an allegation.

As noted above, the costs in this cost category also include non-travel expenses (which HRSA did not specifically address in its response brief). DHA stated in its initial brief that these expenses (as well as the travel expenses) are supported by the documentation in DHA Exhibit 17. DHA Br. at 15. In its Order to Develop Record, the Board directed DHA to "specifically identify the documentation in DHA Exhibit 17 relating to each of the expenses in section G (VISA Expenses) not identified by HRSA as travel costs, e.g., line 501 (medical liability insurance, equipment and software, personal journals), and explain how the documentation establishes that the expense is allowable." Order at 3. In its response to the Order, DHA states that it is resubmitting the documents relating to the non-travel costs as DHA Exhibits 56-73. DHA Response to Order at 1 n.1. DHA asserts that the non-travel costs include "supplies and equipment for DHI projects (including electronic software and hardware), registration and exhibit fees for DHI-related conferences, working meals (with attendees and purpose document), gift cards for DHI program participants (with lists of recipients), DHA vehicle maintenance, medical

14

liability insurance coverage for the 21st Century project clinics (where clinical nurse practitioners were providing primary care services as part of a certified research study), and others." *Id.* at 1-2. However, DHA provides no explanation of how DHA Exhibits 56-73 establish that each of the cost items is allowable, as directed by the Board. Nevertheless, we discuss below two types of cost items for which we have been able to identify the relevant documentation and conclude that a portion of the non-travel costs is allowable.[15]

Line items 499, 500 and 520 include "gift card purchases for budgeted incentives" that were disallowed on the ground that there were no "lists of who received them." *See* DHA Ex. 31. The exhibits corresponding to line items 499 and 500 include several documents captioned "Gift Card Signature Sheet" listing "client" names and the amount $10, $20, $40 or $60 next to each name. DHA Ex. 56, at 26; DHA Ex. 57, at 8-9, 12; 16-17. Each signature sheet also has a space for the signature of each client's outreach worker or mentor, but several of the sheets are missing signatures for some or all of the clients. The caption for some but not all of the signature sheets specifies a year or month and year. We find that the signature sheet at pages 16-17 of DHA Exhibit 57 constitutes adequate documentation of gift card purchases totaling $540 because there are signatures for all of the clients and the caption includes the date January 2011.[16] (The amounts listed on the sheet total $580, but handwritten notes indicate that two gift cards totaling $40 were "returned.") We conclude that none of the other signature sheets adequately document gift card purchases because the clients' outreach workers or mentors did not sign in the space provided, possibly indicating that the gift cards were not received, and/or because there is no date on the signature sheet to indicate that the signature sheet relates to any of the disallowed gift card purchases.

Line item 501 includes medical liability insurance that HRSA disallowed on the ground that such insurance is "not allowed unless for research." DHA Ex. 31. DHA Exhibit 58 includes a document titled "Healthcare Liability Declarations" issued to DHA covering "professional liability." DHA Ex. 58, at 19. The exhibit also includes a requisition for the liability insurance, in the amount of $5,212, with the following justification: "professional liability insurance coverage 21st century clinics – to meet the goal of improved health outcomes, clinic nurse practitioners are providing primary care services as part of an **IRB certified research study**." *Id.* at 18 (emphasis in original). The GPS

---

[15] DHA asserts that the documentation in these exhibits "encompasses more expenses than those now disallowed by HRSA" since DHA cannot determine "which of the expenses in each line item have been allowed by HRSA and which have not." DHA Response to Order at 2. Since HRSA did not file a reply addressing this assertion, we assume that the costs we identify as allowable have not already been allowed by HRSA.

[16] We do not consider whether the documentation establishes that the gift cards were purchased for allowable DHI grant purposes since HRSA did not dispute they were but, instead, disallowed the cost of the gift cards on the limited ground that DHA had not documented who received them.

15

provides that "[m]edical liability (malpractice) is an allowable cost of research programs at educational institutions only if the research involves human subjects" and must be treated as an indirect cost unless special insurance is required as a condition of the grant. GPS at II-35. DHA Exhibit 58 contains no indication that the research study the nurses were involved in was at an educational institution. Thus, the documentation is not adequate to establish that the insurance costs are allowable even if they could properly be treated as direct costs.

Accordingly, we reverse the disallowance with respect to direct costs of $540 and associated indirect costs of $388.80 (72% of $540), and uphold the remaining amount disallowed with respect to this cost category.

## H. Travel Between Offices

DHA charged to the DHI award for budget years 2010-2011 direct costs totaling $9,364.20 and associated indirect costs totaling $6,907.53 for travel costs claimed by employees. HRSA disallowed the costs of a total of 21 line items on the ground that the employees were not on official travel but rather were being reimbursed for the costs of "commuting," i.e., "for meals and mileage from their homes to DHA Offices." HRSA stated that DHA had not provided documentation to support its "claim that expenditures were for mileage while traveling to other DHA offices or to off-campus sites." HRSA Br. at 11-12; *see also* DHA Ex. 31. The Board's Order to Develop Record noted that DHA Exhibit 31 states that travel claims "for each employee" were previously provided to HRSA and directed DHA to provide the travel claims and explain how the travel claims show that each line item in this cost category is allowable. Order at 3.

In its response to the Order, DHA states that it is submitting Exhibits 74-89 and that the travel claims in these exhibits "reflect the dates and miles traveled by the employees away from their official duty stations [listed in DHA Ex. 40] and also contain the explanation of the travel's direct relation to the DHI Grant." DHA Response to Order at 2.

Contrary to what DHA represents, the exhibits it submitted for line items 302-304, 306-307, and 332 do not include travel claims reflecting dates and miles traveled. DHA Exs. 86, 88-89. The exhibits for the remaining line items include travel claims submitted by the employees at issue on claim forms titled "Travel and Expense Reimbursement" or "Expense Reimbursement," but these forms specify only the travel destination and not the location where the travel began. Thus, we cannot determine based on these forms alone that the mileage costs or any meal costs associated with the travel were for official travel as opposed to commuting.

16

However, the exhibits DHA submitted for line items 229, 230 and 232 (all pertaining to a single employee, A.P.) and line item 298 (pertaining to employee E.J.) also include lists of travel dates, the starting and ending locations for each leg of the travel on each date, and the miles for each leg of the travel. As explained below, these lists, together with other information in the record, are a sufficient basis for finding some of these line item costs allowable.

The documentation for A.P. shows travel from Stoneville, MS to Indianola, MS and back. DHA Exs. 74, at 5; 75, at 4-5; 76, at 4. A.P. lived in Greenville, MS (see, e.g. DHA Ex. 74, at 1), and his duty station during the periods in question was Stoneville (DHA Ex. 40).[17] Thus, this documentation establishes that the mileage and meal costs claimed for A.P. for the trips between Stoneville and Indianola were for official travel, not for commuting from his home to his workplace and back. Nevertheless, we uphold in part the disallowance for the line items pertaining to A.P. DHA Exhibit 74 shows that of the $265.24 of direct costs claimed for A.P. on line 229, only $207.79 was for travel.[18] DHA Ex. 74, at 1-3; see also DHA Ex. 31. We therefore reverse the disallowance for this line item only with respect to direct costs of $207.79 and associated indirect costs of $149.61 (72% of $207.79) and uphold the disallowance with respect to direct costs of $57.45 and associated indirect costs of $41.36. We reverse the full amount of the disallowance for line item 230, i.e., direct costs of $351.50 and associated indirect costs of $253.08. See DHA Ex. 31. We do not reverse any of the disallowance for line item 232, i.e., direct costs of $55.50 and associated indirect costs of $39.96, because we cannot determine how the $55.50 relates to the amounts shown on the Expense Reimbursement form, which total $740.46. DHA Ex. 76, at 3; see also DHA Ex. 31.

The documentation for E.J. shows travel between Stoneville and Indianola. DHA Ex. 85, at 4-5. E.J. lived in Greenville (see, e.g., DHA Ex. 85, at 3), and his duty station during the period at issue was Indianola (DHA Ex. 40). Thus, this documentation establishes that the mileage and meal costs claimed for E.J. for the trips between Stoneville and Indianola were for official travel, not for commuting from his home to his workplace and back. We therefore reverse the full amount of the disallowance for line item 298, i.e., direct costs of $708.95 and associated indirect costs of $510.44. See DHA Ex. 31.

Accordingly, we reverse the disallowance with respect to direct costs of $1,268.24 and associated indirect costs of $913.13 and uphold the remaining amount disallowed with respect to this cost category.

---

[17] DHA Exhibit 40 contains no indication of the source of the information regarding the employees' duty stations. We nevertheless rely on it here since HRSA has not disputed its accuracy.

[18] The remaining amount was for supplies, and DHA did not specifically address these costs in its response to the Order.

17

## I. __J.H. Travel__

DHA charged to the DHI award for budget years 2011-2012 direct costs totaling $10,922.36 and associated indirect costs totaling $7,864.09 for travel costs of J.H. as well as the cost of an iPhone and a printer for J.H.'s use. HRSA disallowed the costs on the ground that J.H. was not on official travel when he travelled from his home in Southaven, MS to DHA's Ridgeland, MS office because J.H.'s duty station was Ridgeland and on the ground that the iPhone as well as a printer located in J.H.'s home were unallowable personal expenses. HRSA Br. at 13; DHA Ex. 31. DHA asserts that, during the periods at issue, J.H.'s duty station was at his home in Southaven and all of the costs are therefore allowable. DHA Br. at 16. DHA noted that the travel costs included lodging near DHA's offices in Oxford, Stoneville and Ridgeland and that J.H. travelled between those locations "as needed from day to day." _Id._ at 15-16. DHA provided a copy of J.H.'s Flexible Workplace Agreement, which shows his home address in Southaven as his duty station. DHA Ex. 41.

The Board's Order to Develop Record stated that J.H.'s Flexible Workplace Agreement shows that Southaven was J.H.'s official duty station as of July 2011, relying on the fact that the agreement was signed by the parties on July 27 and 28, 2011. Order at 3. Thus, the Order indicated that only travel costs incurred after the agreement was signed could be allowed, directing DHA to "specifically identify the line items for budget year 2011 it contends were incurred in July 2011 or after that date and ... provide source documentation that shows the date each such line item was incurred." _Id._ In its response, DHA stated, "Although [J.H.]'s Flexible Workplace Agreement was not executed until July 2011, [J.H.] was hired in late March 2011 on the understanding that he would be working out of his Southaven home office, and immediately thereafter he began traveling regularly to Ridgeland to oversee the EHR group." DHA Response to DHA at 2-3, citing DHA Ex. 58, at 2. DHA also submitted an exhibit that it said "includes documentation for every disputed line item" in this cost category. _Id._ at 2, citing DHA Ex. 90.

DHA Exhibit 58, at 2, is a document dated April 20, 2011 titled "DHA EHR Personnel Announcement" which announces in relevant part that J.H. "has been hired as Assistant Vice President, Information System[.]" However, this document contains no indication of J.H.'s duty station or the locations where he would be working. Thus, DHA failed to establish that Southaven was J.H.'s duty station earlier than July 27 or 28, 2011.[19]

---

[19] In addition, DHA Exhibit 40 (not cited by DHA with respect to this cost category) appears to undercut DHA's position that Southaven was J.H.'s duty station since it shows that J.H. was hired on March 21, 2011 and that his duty station until at least December 31, 2011 was "Memphis – Home Based Office."

18

Moreover, although DHA claims that DHA Exhibit 90 "includes documentation for every disputed line item" (DHA Response to Order at 2), we are, with one exception, unable to determine when the travel costs were incurred since the Travel Reimbursement forms in that exhibit do not clearly correspond to the direct costs of any of the line items except one. The Travel Reimbursement form for line item 324 shows that that those travel costs was incurred before July 27, 2011, the earliest date for which J.H.'s travel costs could be allowable. DHA Ex. 90, at 69. Thus, there is no basis for allowing any of the travel costs.

Moreover, we conclude that the costs of the iPhone and printer are unallowable. The record shows that these items were purchased on May 20, 2011. DHA Ex. 90, at 1. As we found above, DHA failed to establish that Stonehaven was J.H.'s duty station before July 27, 2011. Thus, these items were personal expenses at the time they were purchased. While there is no dispute that these items were used at Stonehaven once it became J.H.'s duty station, DHA does not provide any basis for finding that costs that are unallowable at the time they are incurred may become allowable based on their subsequent use.

Accordingly, we uphold the disallowance with respect to this cost category.

## J. Meals at DHA Meetings

DHA charged to the DHI award for budget years 2010-2012 direct costs totaling $5,661 and associated indirect costs totaling $3,458.44 for the cost of meals during DHA meetings. HRSA disallowed the costs on the ground that they were not allocable to the DHI grant, citing the following provision of the GPS: "When certain meals are an integral and necessary part of a conference (i.e., a working meal where business is transacted), grant funds may be used for such meals...."[20] HRSA Br. at 13, citing GPS at II-96. DHA maintained that it had submitted documentation to HRSA showing the "business purpose" of the meals. DHA Reply Br. at 10. The Board's Order to Develop Record directed DHA to "provide any source documentation previously submitted to HRSA that includes this information and explain how it shows that each line item in [this cost category] was incurred for a 'working meal' within the meaning of the" GPS provision quoted above. Order at 3. DHA contends that the documentation in DHA Exhibits 91-92, provided in response to the Order, "lists the attendees and explains the business purposes of the meals." DHA Response to Order at 3. As discussed below, none of the documentation is adequate to establish that the meal costs are allowable.

---

[20] Although the GPS refers specifically to meals that "are an integral and necessary part of a conference," we need not reach the question whether this requires that meal costs be incurred during a conference to be allowable.

19

DHA Exhibit 91 includes documentation that relates to line items 70-75. DHA Ex. 91, at 1-2. For each line item, there is a Request for Payment form from "Pharmacy Practice" to the University of Mississippi that specifies the purpose of the meal or meals and the individuals involved. The purposes specified include breakfast or lunch for "Physician Outreach" and lunch or dinner "with Community Pharmacy Residency Candidates." *Id.* at 8, 10, 12, 14, 19, 21. The exhibit also includes a budget justification for "DHI Project #29: Delta Pharmacy Patient Care Management Project" for budget year 2010 and an unsigned statement asserting that the budget shows that "residency and physician outreach" were objectives of that project. *Id.* at 1-7. However, even if physician outreach and recruiting pharmacy residency candidates were activities within the scope of the DHI grant, it does not necessarily follow that meals with physicians and pharmacy residency candidates were allowable costs. Nothing in the documentation described above shows that the meals themselves had a business purpose rather than a solely social purpose, i.e., that the meals were "working meals" within the meaning of the GPS.

DHA Exhibit 92 includes documents that relate to the remaining 12 line items in this cost category. For each of five line items, DHA provided a memorandum on DHA letterhead dated in June 2012 and addressed to HRSA auditors with the subject line "Expense for Meeting" and a description of the meeting purpose that suggests that the meeting (during a meal) was related to the DHI grant. DHA Ex. 92, at 9, 13, 19, 32, 55. However, there is no supporting documentation for these descriptions. For another line item, DHA provided a statement describing a meeting purpose that appears to be related to the DHI grant, but the statement is undated and unsigned. *Id.* at 38. The documentation for the remaining line items does not specifically identify a business purpose for the meeting. Thus, none of the documentation provided is sufficient evidence to reverse the disallowed meal costs.

Accordingly, we uphold the disallowance with respect to this cost category.

### K. Event Costs

DHA charged to the DHI award for budget years 2010-2011 direct costs totaling $6,679.43 and associated indirect costs totaling $4,553.42 for event costs, including rental of space and provision of refreshments at a "gala" celebration at the B.B. King Museum to celebrate the one-year anniversary of the Indianola Promise Community. HRSA disallowed the costs on the ground that they constituted "entertainment costs." HRSA Br. at 14. The cost principles at 2 C.F.R. Part 230, Appendix B, ¶ 14 provide that entertainment costs, "including amusement, diversion, and social activities and any costs directly associated with such costs..." are unallowable. In addition, HRSA found the costs unallowable on the ground that the documentation in DHA Exhibit 18

20

(cited in DHA's brief) does not show that any of the costs have "a sole purpose of meeting the objectives of the DHI award" and thus, although the costs "may have benefitted the DHI grant, ...they also benefitted the other work of DHA." HRSA Br. at 14.

DHA disputes that the costs are "entertainment costs" and argues that the documentation in DHA Exhibit 18 shows that the costs were incurred instead "for community education, delivery of program services, and the dissemination of technical information relating directly to HRSA-approved goals and objectives," specifically the goal "conduct community-based educational events." DHA Br. at 18; DHA Reply Br. at 10. DHA also asserts that "for the vast majority of the period under review, the DHI Grant was the only source of funding for DHA to provide health services in the region, and DHA has no 'other work' unrelated to the goals and objectives of the DHI" so that "all community programming during the time period in question necessarily related to DHI." DHA Reply Br. at 11.

We need not reach the question of whether the costs are entertainment costs since we conclude that DHA has not met the burden of showing that a questioned cost is in fact allocable to the award to which it is charged. As we noted in our discussion of the costs in cost category F, DHA's reference to the "vast majority of the period under review" in effect acknowledges that for part of the years at issue, DHA had programs other than the DHI grant to which the costs at issue might be allocable. In addition, HRSA could reasonably question whether all of the costs at issue were properly allocated to the DHI grant based on the undisputed fact that during the two years at issue, DHA received numerous federal grants in addition to the DHI grant as well as some non-federal funding. *See* DHA Ex. 1; DHA Ex. 6, at 2.

Accordingly, we uphold the disallowance with respect to this cost category.

## M. DCG Invoices[21]

DHA charged to the DHI award for budget years 2010-2011 direct costs totaling $42,182.50 for payments made under a contract with DCG, Inc. HRSA disallowed the costs on the grounds that the purpose of the services provided was unclear and invoices for the services billed by DCG or its subcontractor were missing or lacked support. HRSA Br. at 15. In addition, HRSA found the costs unallowable on the ground that the

---

[21] DHA's briefs have a heading titled "L. DHI Partners Workshops" but DHA then states that the direct and indirect expenses in this category were included in other cost categories, and there is no discussion under this heading. DHA Br. at 18 n.5; DHA Reply Br. at 11 n.8.

21

documentation in DHA Exhibits 19-27 (cited in DHA's brief) does not show that any of the costs have "a stated purpose of only meeting the objectives of the DHI award" and thus, although the costs "may have benefitted the DHI grant, …they also benefitted the other work of DHA." HRSA Br. at 15.

DHA asserts that DCG "provided public policy development, statistical analysis, design and multimedia publication to inform our communities of DHI programs, and consulting services in connection with planning for the Indianola Promise Community project[.]" DHA Reply Br. at 12. DHA argues that the costs of these services are allowable because its contract with DCG was approved by HRSA and the costs were within the approved budget. *Id.* DHA also asserts:

> [F]or most of the period under review, the DHI Grant was the only source of funding for DHA for these types of services. The Indianola Promise Community project was an integral and HRSA-approved part of the Delta Health Initiative, not imagined "other work of DHA." Furthermore, there was no other external funding under DHA's control that was providing these types of services in the DHI service area during the review period.

DHA Reply Br. at 12.

We need not reach the question of whether the costs are otherwise allowable since we conclude that DHA has not met its burden of showing that a questioned cost is in fact allocable to the award to which it is charged. As indicated in our discussion of the costs in cost category F, DHA's reference to "most of the period under review" in effect acknowledges that for part of the years at issue, DHA had programs other than the DHI grant to which the costs at issue might be allocable. In addition, HRSA could reasonably question whether all of the costs at issue were properly allocated to the DHI grant based on the undisputed fact that during the two years at issue, DHA received other federal funding for the Indianola Promise Community in addition to the DHI grant. *See* DHA Ex. 1 (listing Department of Education planning grant for the period October 2010-September 2011).

Accordingly, we uphold the disallowance with respect to this cost category.

## O. KEPLERE INSTITUTE[22]

DHA charged to the DHI award for budget years 2010-2011 direct costs totaling $79,584.48 for payments to the Keplere Institute for a summer program it operated.

---

[22] DHA concedes that the $23.33 of direct costs in cost category N (consisting of a single line item, 438) is unallowable. DHA Reply Br. at 3.

22

HRSA disallowed the costs on the grounds that the documentation DHA submitted on appeal to support the costs, DHA Exhibit 28, "was not sufficient to determine whether the expenses supported the objectives of the DHI award" and that although the costs "may have benefitted the DHI grant,...they also benefitted the other work of DHA." HRSA Response at 16.

DHA asserts that the summer program provided "workforce training in pharmacy tech" and "was exactly the type of community-based partnership proposed in the Indianola Promise Community model and fulfilled exactly the type of service needed by the community and approved by HRSA." DHA Reply Br. at 13. DHA also asserts that it had no "other work" that benefitted from this program. *Id.* DHA cites no support for its general assertion that the summer program "fulfilled exactly the type of service . . . approved by HRSA." The program was funded in response to a request for proposals (RFP) stating in part:

> The Indianola community is an impoverished rural area located in the Mississippi Delta that suffers from chronic social, health and economic problems. . . .Many of the parents who do have jobs must commute a long distance for employment. This means that some children may spend long hours in the home, unsupervised, while school is not in session. Providing a positive and enriching experience for these children is a major objective of the Delta Promise Community Summer Program. To help keep students motivated for growing and learning during the summer, the Delta Promise Community will offer a summer enrichment program through funding mini-grants to organizations that will provide educational as well as healthy lifestyles activities to students....

DHA Ex. 28, at 1-2 (excerpts from RFPs for 2010 and 2011 Funding Opportunity). It is not apparent how the objective of the summer program, as described here, was consistent with the objectives of the DHI grant. In the absence of any showing by DHA that the costs were incurred for purposes of the DHI grant, we cannot find that the costs are allowable.[23]

Accordingly, we uphold the disallowance with respect to this cost category.

---

[23] This shortcoming also makes it likely that the costs incurred for the summer program benefitted other work of DHA, as HRSA found. However, we do not rely on such a finding as a basis for upholding the disallowance since, unlike the other cost categories for which HRSA raised this issue, DHA has not conceded that the costs here benefitted other programs for any part of the period at issue.

## P. MHA EHR Project

DHA charged to the DHI award for budget year 2011 direct costs totaling $152,474.83 for payments made to DHA subawardee MHA Health, Research & Educational Foundation (MHA-F) for its contract with Coker Group for IT consulting and CIO oversight. HRSA disallowed the costs on the ground that the salaries paid under the contract were unreasonable in amount and on the ground that expenses for renting an apartment, including furniture and utilities, were unallowable personal expenses. DHA Ex. 31; HRSA Br. at 17. HRSA specifically found unreasonable payments of $31,000 and $33,900 for "consultant salary." DHA Ex. 31, lines 51 and 52. HRSA also found "unreasonable" a payment of $16,800 for "consulting to provide 'interim CIO Management'" because it represented "[c]harges of $1,600 per day" or an "[a]nnualized salary of $624,000[.]" *Id.*, line 59. HRSA identified another payment of $66,786 as "[u]nreasonable salary and rent for CIO." *Id.*, line 53. The remaining amounts disallowed were for apartment rental as well as cable TV, electricity and furniture rental for the apartment.

DHA does not deny that an annualized salary of $624,000 per year for the CIO (Chief Information Officer) would be excessive. However, DHA terms HRSA's statement regarding the CIO's annualized salary "a remarkable misrepresentation," stating:

> As explained in Exhibit 29, no individual consultant was contracted with and no individual was paid. Only the Coker Group was paid, and its pay included a shared CIO, together with multiple other professionals and Coker's entire legal and clinical technology departments.

DHA Reply Br. at 14. DHA also argues that all of the costs are allowable because the total amount paid under the contract was less than "HRSA's approved budget…while meeting all of HRSA's approved goals and objectives." *Id.*

The exhibit on which DHA relies includes a budget narrative for the Electronic Health Records (EHR) project stating in relevant part:

> **Consultant Subcontract** will be executed with Coker Group for the provision of a chief information officer/HIT [health information technology] project implementation specialist to be shared across the 3 hospitals selected to participate in the project. Additional Coker will provide content experts during HIT implementation to deliver services specialized to work plan matrix and hospital need assessment. **($272,125)** as follows.

DHA Ex. 29, at 43 (bold in original). The budget consists of $150,000 for the CIO's salary (including "$25,000 for benefits + $25,000 bonus for achievement of deliverables and project targets"); $37,500 for expert consultants "at $2,500/day X 5 days X 3

hospitals"; $31,500 for travel, lodging and meals at "$150/day X 3 days/week X 50 weeks = $22,500 plus airfare for consultant travel at $600 per trip X 15 - $9000."[24] *Id.* at 44.

The CIO's salary shown in the budget appears to be for a period of 50 weeks since travel, lodging and meals are budgeted for that period. Thus, if the benefits and bonus are included, the CIO's annualized salary would be slightly more than $150,000. In addition, since the budgeted amount of $2,500 per day was for "expert consultants," the amount paid to any one consultant would be less, with the amount depending on the number of such consultants. However, the budgeted amounts do not correspond to the payments actually made for salaries, as shown on the spreadsheet at DHA Exhibit 31, and DHA provided no information based on which we can reconcile those amounts. Thus, even assuming the amounts budgeted for consultants' salaries are reasonable, we cannot determine that the payments actually made were reasonable.

DHA's briefing does not refer specifically to the apartment rental expenses. Although DHA provided a June 22, 2012 "Response to HRSA Audit Questions" that indicates that a furnished apartment was rented for the CIO, who lived out of state (DHA Exhibit 29, at 1), it provided no source documentation for that information. Moreover, the budget includes an amount for "travel, lodging and meals" but does not specify that it includes rental of an apartment for the CIO. Thus, the documentation provided is insufficient to show that the apartment rental and related cost items were not personal expenses.

Accordingly, we uphold the disallowance with respect to this cost category.

## Q. Telepsych

DHA charged to the DHI award for budget year 2011 direct costs of $1,299.60 for rental of a banquet hall and meals for a lunch meeting. HRSA disallowed the costs on the ground that the meals were not allocable to the DHI grant and that "the documentation provided by DHA was not sufficient to determine how the expenses supported the objectives of the DHI award." HRSA Br. at 17.

DHA asserts that the meeting was "on the topics of reducing disparities in mental health treatment in the Delta and improving the quality of mental health services delivered at community mental health centers." DHA Br. at 25, citing DHA Ex. 32; *see also* DHA Reply Br. at 14. DHA further asserts that the "meeting was called in response to significant growth of the Delta Telepsychiatry Network, a DHI program[.]" *Id.* DHA Reply Br. at 15.

---

[24] The record does not show any disallowance for the airfare costs or for a management fee of $53,125 that was also identified in the budget narrative as a contract cost.

DHA's assertions regarding the meeting topics and why the meeting was necessary, although undisputed by HRSA, are not a sufficient basis on which to conclude that the meeting was related in whole or in part to the DHI grant. Significantly, DHA asserts only that the meeting was "called in response to the growth" of a DHI program, not that the meeting was for program purposes. Nor does DHA contend that the topics discussed at the meeting pertained directly to that program. Even if the meeting topics were directly related to the telepsychiatry program, it is unclear why the meeting costs were allocated solely to the DHI grant since the record shows that DHA received a telepsychiatry program grant from USDA that covered the period at issue. DHA Ex. 1, at 1.

Accordingly, we uphold the disallowance with respect to this cost category.

### R. Dissemination of Information

DHA charged to the DHI award for budget years 2010-2011 direct costs totaling $1,375.13 and associated indirect costs totaling $1,012.21 for travel to events and event costs including rental of an exhibitor booth and a "giveaway" item. HRSA disallowed the costs on the ground that they were incurred for advertising activities that did not directly benefit the objectives of the DHI grant. HRSA Response at 18. DHA does not dispute that the costs were not incurred for any of the types of advertising activities that are allowable under the cost principles at 2 C.F.R. Part 230, Appendix B, ¶ 1.c. However, DHA argues that the costs are allowable public relations costs under other provisions of Appendix B, paragraph 1, because they were incurred for "public relations activities required pursuant to HRSA-approved DHI goals and objectives." DHA Reply Br. at 15, citing DHA Exs. 32, at 30; 34, at 22.

Paragraph 1.b of Appendix B states that the "term public relations includes community relations and means those activities dedicated to maintaining the image of the non-profit organization or maintaining or promoting understanding and favorable relations with the community or public at large or any segment of the public." As relevant here, allowable public relations costs include "(2) Costs of communicating with the public and press pertaining to specific activities or accomplishments which result from performance of Federal awards (these costs are considered necessary as part of the outreach effort for the Federal award[.]" 2 C.F.R. Part 230, App. B, ¶ 1.d. In addition, paragraph 1.f of Appendix B specifies certain unallowable public relations costs including "[c]osts of meetings, conventions, convocations, or other events related to other activities of the non-profit organization, including ...[c]osts of displays, demonstrations, and exhibits" and "[c]osts of promotional items and memorabilia, including models, gifts, and souvenirs[.]"

The documents DHA cites in support of its position appear in the DHI program narratives for the 2010 and 2011 budget years, each of which includes a table with the caption "Four: Assist with project evaluation and dissemination of results." DHA Exs. 32, at 30; 34, at 22. The table includes as objectives, "Conduct an evaluation of each individual

project as well as the impact of the Delta Health Initiative as a whole" and "Provide HRSA, project partners and stakeholders with a comprehensive final report on process and outcome results." *Id.* The activities listed to meet these objectives include "Disseminate results." *Id.* However, DHA does not point to anything in the record that identifies the specific events for which the costs at issue here were incurred or explains the relationship of the events to the DHI grant. Thus, there is no basis for finding these costs were allowable even assuming that events that disseminate the results of project evaluations qualify as a type of public relations cost under paragraph 1.d(2) of Appendix B. Instead, since it is undisputed that the costs at issue included rental of an exhibitor booth and a "giveaway," the costs on their face appear to be unallowable public relations costs under paragraph 1.f. of Appendix B.

Accordingly, we uphold the disallowance with respect to this cost category.

## S. Addditional Issues

This cost category consists of six line items totaling $9,828.50 of direct costs and $818.21 of associated indirect costs.

Lines 68 and 69
HRSA found that DHA charged to the DHI award for budget year 2011 direct costs of $2,548.70 (line 68) and $6,155.90 (line 69). HRSA disallowed the costs on the ground that they were for a meeting and promotional expenses that are unallowable. DHA Ex. 31. DHA asserts that only a small amount of these costs was paid for with grant funds. DHA Br. at 26; According to DHA, it drew down only $117.18 of the line 68 amount and $11.00 of the line 69 amount. DHA Ex. 31. DHA states that it previously provided "detailed documentation of the draws associated with [each of these] charge[s]" to HRSA. *Id.*

In response to the appeal, HRSA notes that DHA argued that "only a small fraction of the amount disallowed was actually charged to the grant" but maintains that these line items are unallowable meeting and promotional expenses. HRSA Br. at 18-19. HRSA also states that "DHA did not provide any documentation as part of its Appellant's Brief to support its claim that these costs are either allowable costs or directly benefitted the objectives of the DHI award." *Id.* at 19. Since HRSA does not deny that DHA submitted documentation showing that it drew down only $117.18 of the line 68 amount and $11.00 of the line 69 amount, we conclude that the remaining amounts—$2,431.52 for line 68 and $6,144.90 for line 69—were not properly disallowed. However, we conclude that the amounts DHA admits were charged to the grant were unallowable since DHA does not state any reason why they should be allowed.

Lines 80 and 98
DHA charged to the DHI award for budget year 2012 direct costs of $128.40 and associated indirect costs of $92.45 (line 80) and direct costs of $695.50 and associated indirect costs of $500.76 (line 98). HRSA disallowed the costs on the ground that the costs of KeyPad entry and termite treatment for an office are not allowable as direct charges. DHA Ex. 31. DHA asserts that these costs were "for the IPC [Indianola Promise Community] Headquarters Renovation, which was 100% DHI funded." DHA Br. at 27.

In its response to the appeal, HRSA notes that DHA argued that "charges were for the IPC Headquarters Renovation" but maintains that these line items are not allowable as direct costs. HRSA Br. at 18-19. Even if it is undisputed that the costs in line items 80 and 98 were incurred as part of the renovation, it does not necessarily follow that the renovations benefitted only the DHI award and are properly charged as direct costs. DHA does not point to anything in the record to show that the DHI award for budget year 2011 included any funds for this renovation much less that the DHI award covered all of the renovation costs. Thus, DHA has not shown that the costs are allowable.

Lines 342 and 343
DHA charged to the DHI award for budget year 2010 direct costs totaling $300 and associated indirect costs totaling $225 (lines 342 and 343) for certification exam fees. HRSA disallowed the costs on the ground that these fees "are a personal expense." DHA Ex. 31. DHA asserts that the costs "were for a network certification required by the EHR [Electronic Health Records] vendor." DHA Br. at 27. HRSA notes that assertion but maintains that these line items are unallowable personal expenses. HRSA Br. at 18-19.

Even if it undisputed that the costs in line items 342 and 343 were for a network certification required by the EHR project vendor, it does not necessarily follow that the costs were allocable to the DHI grant. DHA does not point to anything in the record to show who took the certification exam, what type of certification was involved, and whether that certification was necessary for the exam taker to work on DHI's EHR project and/or other projects. Absent such information, we cannot determine whether the costs at issue are allowable.

In summary, we reverse the disallowance of direct costs of $8,567.42 ($2,431.52 plus $6,144.90) and uphold the remaining disallowance with respect to cost category S.

## T. **Additional Single Items**

This cost category consists of 23 line items totaling $90,279.13 of direct costs and $41,439.60 of associated indirect costs.

Line 63
DHA charged to the DHI award for budget year 2011 a direct cost of $684.04 for the
"Tar Wars Project." HRSA disallowed this cost on the ground that this was not a DHI
project. DHI Ex. 31.[25]   In response to the Board's Order to Develop Record, DHA
provided a document titled "Memorandum of Agreement between [DHA] and MS
Academy of Family Physicians Foundation for The TAR Wars Project[.]" DHA Ex. 93,
at 10.[26]  The agreement, signed in February 2011, states that the parties have prepared the
agreement "to establish, support and promote a collaborative effort to accomplish the
goals of the Delta Health Initiative grant project (HRSA Grant #U1FRH07411[.])." Id.
Appendix B of the agreement is the Mississippi Academy of Family Physicians'
Foundation "Grant Application to the Delta Health Alliance" for a project titled
"Presentation of Tar Wars to 4th and 5th Graders in the Mississippi Delta Communities"
that will "bring a tobacco-free cancer-prevention program" to these students. Id. at 25.
This documentation clearly shows that the costs at issue were for a DHI project.
Accordingly, we reverse the disallowance with respect to this line item.

Line 66
DHA charged to the DHI award for budget year 2010 direct costs totaling $1,532.80 for a
projector ($918), a projector screen ($348), and 80 t-shirts ($266.80). HRSA disallowed
these costs on the ground that they were "unreasonable expense[s]." DHI Ex. 31.
DHA explained these expenses as follows:

> These items were included in the HRSA approved budget and work plan matrix.
> The costs ...are reasonable and customary. The projector required needed to have
> a high lumen rating in order to be seen in room with ambient lighting and offered
> good video resolution for the projection of educational programs, hence a mid-line
> projector was purchased. T-shirts were an essential part of encouraging
> enrollment and tracking participants during off site events.

DHA Ex. 8, at 45.

In response to the Board's Order, DHA provided pages from an office supply catalog
showing multimedia projectors priced between $199 and $1,650, and projector screens
priced between $25.40 and $1,221.47. DHA Ex. 94, at 4-10. Given these price ranges

---

[25] HRSA used the words "not HRSA" in stating the reason for the disallowance, but it is clear in context
that "not HRSA" meant not a DHI project.

[26] DHA submitted DHA Exhibits 93-101 primarily in response to the direction in the Board's Order to
provide documentation that DHA's May 2013 response to the review report (DHA Exhibit 8) indicated was being
submitted to HRSA with that response.   Order at 3-4.

and DHA's explanation of the need for a high quality projector, DHA's expenditures for these two items do not appear unreasonable, and HRSA has not provided any information to support its contrary conclusion.[27]

DHA Exhibit 94 also includes an invoice for 80 t-shirts at a unit price between $6.95 and $8.95 but no justification for the price. DHA Ex. 94, at 18. Moreover, while DHA's explanation quoted above states that the t-shirts were used "for encouraging enrollment and tracking participants during off site events," a June 25, 2012 memorandum addressing "HRSA Audit Questions about the DELP project" in DHA Exhibit 94 states, "It is our understanding that the t-shirts were for the teachers to wear while teaching." DHA Ex. 94, at 1. DHA did not submit any source documentation to establish how the t-shirts were actually used. Accordingly, DHA failed to show that the t-shirts were a reasonable expense even apart from the price.

Accordingly, we reverse the disallowance for the projector and projector screen costs (a total of $1,266) but uphold the disallowance of the costs for t-shirts ($266.80).

Line 77
DHA charged to the DHI award for budget year 2010 a direct cost of $70.00 that HRSA identified as a "meeting room rental" and disallowed on the ground that it was not reasonable. DHA Ex. 31. DHA submitted an invoice for "**GOTCHA** Cabin Meeting Room Rental" (DHA Exhibit 95) but gave no explanation for the rental. Thus, DHA failed to show that this cost was reasonable, and we uphold the disallowance with respect to this line item.

Line 87
DHA charged to the DHI award for budget year 2011 direct costs of $374.50 and associated indirect costs of $269.64 for maintenance of the Stoneville air conditioning. HRSA disallowed the costs on the ground that they were allowable only as indirect charges. DHA Ex. 31. DHA asserts that costs were for maintenance of a specialized air conditioning system for the server room for DHI's EHR project and did not include maintenance for any of the other air units that provide regular cooling for the Stoneville facility. DHA Ex. 8, at 45. In response to the Board's Order to Develop Record, DHA submitted a maintenance agreement with Donahoo Heating Cooling & Electric (the company to which the payments at issue were made) that describes the equipment covered as "Computer Server Room." DHA Ex. 96, at 15. DHA also submitted a June 25, 2012 memorandum to "HRSA Auditors" from J.H. regarding "Expense for Server Room Air Conditioner." *Id.* at 1. The memorandum states that the "EHR project requires a LARGE amount of server equipment with its own dedicated server room in

---

[27] We do not consider whether these costs were allocable solely to the DHI award since HRSA did not disallow the costs on that basis.

DHA's building," that the air conditioner at issue "ONLY provides cooling for that room," and that contractors other than Donahoo provided maintenance "for the general cooling systems in our building." *Id.* The record shows that J.H. was an Assistant Vice-President for DHI's EHR project (*see* DHA Exhibit 58, at 2); thus, he was a reliable source of information about this matter. We therefore conclude that DHA provided adequate documentation to establish that the costs at issue here were properly treated as direct costs of the DHI award, and we reverse the disallowance with respect to this line item.

Lines 102 and 411
DHA charged to the DHI award for budget years 2010-2011 direct costs totaling $567 and associated indirect costs totaling $411.21 for a "Gotowebinar." HRSA disallowed the costs on the ground that the expense was "incurred without proper approvals and without reasonable care to avoid duplicative charges" and "[d]id not follow proper procurement procedures." DHA Ex. 31. HRSA indicated that a "GotoMeeting invoice paid earlier in the FY" was a duplicate charge. *Id.* DHA asserts that "these multiple accounts were NEEDED for technical assistance from the Clinical Analysts in the EHR department" and that it obtained the "approvals from supervisor, compliance officer, and accounting[.]" DHA Ex. 8, at 45.

In response to the Board's Order to Develop Record, DHA submitted four receipts, e-mailed on September 6, 2009, October 6, 2009, November 6, 2009 and January 6, 2010, for GoToWebinar Personal Monthly Plans expiring October 5, 2009, November 5, 2009, December 5, 2009, and February 5, 2010, respectively, at a cost of $99.00 each. DHA Ex. 97, at 5, 11, 13, 15. DHA also submitted a June 25, 2015 memorandum to "HRSA Auditors" that states: "The multiple Go To Meeting accounts were used for technical support for our EHR project. There were multiple charges because we needed multiple accounts for the support. Several Clinical Analysts might be using an account at the same time in order to provide implementation support or technical assistance." DHA Ex. 97, at 1. Even if this explanation is sufficient to establish that there were no duplicate charges for webinar accounts, DHA has failed to show that the purchases were made in accordance with DHA's own approval requirements.[28] DHA submitted two Requisition forms and two Expense Reimbursement forms (*id.* at 3, 8, 9, 17) but does not explain how the dates or amounts on these forms correspond to the receipts for the four GotoWebinar accounts at issue here. Accordingly, we uphold the disallowance with respect to these line items.

---

[28] DHA does not dispute that such a failure would be a proper basis for the disallowance.

Line 162
DHA charged to the DHI award for budget year 2011 direct costs of $121.98 and
associated indirect costs of $87.83 for a mini-fridge. HRSA disallowed the costs on the
ground that the mini-fridge was shipped to a home address and was an unallowable
personal item. DHA Ex. 31. DHA asserts that the mini-fridge was located in its office
and contained only medical supplies. *Id.*; DHA Ex. 8, at 45. DHA also asserts that
HRSA approved the cost of a lock for the mini-fridge. DHA Ex. 8, at 45. DHA
submitted an order summary for a 4.5 cu. Ft. compact refrigerator, in black, with the
notation "Ship to Home" above a name and address. DHA Ex. 98, at 1. In addition,
DHA submitted a photograph of part of a room with a refrigerator that appears to fit the
description on the order summary with a sign on it containing the words "test kits."
(There are other words, but they are not legible.) *Id.* at 2. Nothing in the photograph
identifies the refrigerator as being located in DHA's offices nor does DHA explain why it
was shipped to a home address if it was intended to be used in DHA's offices. While the
sign "test kits" certainly suggests that the refrigerator was purchased for laboratory or
medical use, the documentation submitted by DHA does not establish that any such use
related to the DHI grant and exclusively to that grant. Accordingly, we uphold the
disallowance with respect to this line item.

Line 180
DHA charged to the DHI award for budget year 2010 direct costs of $2,549.43 and
associated indirect costs of $1,912.07 for the cost of an April 10, 2010 reception catered
by Aramark.[29] HRSA disallowed the costs on the ground that meal costs are not
allowable. DHA Ex. 31. In response to the Board's Order to Develop Record, DHA
submitted a June 19, 2012 document titled "Project 21 DHA Audit Responses" that states
that the reception was a "Leadership Celebration,...a yearly event that recognizes
exemplary program graduates and superintendents in the Delta Area who provide
exceptional support to the Leadership Study Program" and was "designed to promote
continued support for the program in our area schools where our graduates are employed
and serving as mentors for internships." DHA Ex. 99, at 3. This describes a social event,
not a "working meal" within the meaning of the GPS. The document also states: "The
Leadership Celebration was specifically addressed in the approved No Cost Extension of
2009-10 funds budget narrative[.]" *Id.* DHA does not cite to any budget narrative in the
record, but even if the event was mentioned in the budget narrative for the DHI grant, it
does not necessarily follow that HRSA approved the use of DHI funds for the meals at

---

[29] DHA noted on the spreadsheet for lines 180 and 181 "No Indirect cost should be charged." DHA Ex.
31, column titled "Additional Rebuttal." Since we uphold the disallowance of the direct costs, we need not seek
clarification of what DHA meant by this.

issue. We also note that both the Purchase Requisition for the catering and the file copy of the payment made to Aramark show the amount as $1,324.15 rather than the $2,549.43 disallowed. DHA Ex. 99, at 8-9. DHA did not explain this discrepancy. Accordingly, we uphold the disallowance with respect to this cost item.

Line 181
DHA charged to the DHI award for budget year 2011 direct costs of $685.44 and associated indirect costs of $1,637.44 for furniture.[30] HRSA disallowed the costs on the ground that the furniture was "not necessary and was purchased at the end of the funding period." DHA Ex. 31. DHA submitted a Purchase Requisition dated June 29, 2010 for eight "Task Chairs to replace broken chairs in CTL Training Lab." DHA Ex. 99, at 15. The purchases shown on the June 29, 2010 requisition are arguably allocable to budget year 2011, beginning July 1, 2010, so that DHA could reasonably charge them to that budget year. However, there is a discrepancy between the total amount shown on the requisition, $952.00 total, and the direct costs of $685.44 disallowed for this line item. This discrepancy, which DHA does not explain, calls into question whether this requisition relates to the purchases at issue here. Accordingly, we uphold the disallowance with respect to this line item.

Line 216
DHA charged to the DHI award for budget year 2010 direct costs of $6,217.52 and associated indirect costs of $4,663.14 for miscellaneous costs charged to DHA's VISA account. HRSA initially disallowed the costs on the ground that they were for unreasonable expenses or there was no explanation for the expenses. DHA Ex. 31. HRSA later found that additional documentation submitted by DHA during the review did not show that the costs were allowable. DHA Ex. 8, at 45. Specifically, HRSA found that: charges for gasoline purchased by four individuals were not shown to be necessary for the DHI grant; office supplies were "already purchased by DHA" and "duplicative"; and travel for a "HRSA grantee conference" was "not on an approved travel voucher and did not contain enough information about the program purpose." *Id.*

DHA takes the position that the gasoline charges are allowable because "[t]hese employee[s'] Level of Efforts were routinely more than 50/50 on DHI grant[.]" DHA Ex. 8, at 45. DHA submitted a list of the individual costs at issue on which it noted that three of the four individuals who charged gasoline purchases were driving a "DHA vehicle" and that the "usage" or "charges" were split between the DHI grant or a subgrant and

---

[30] It is unclear from the record why the amount of associated indirect costs exceeds the amount of direct costs.

33

either "Administration" or "indirects." DHA Ex. 100, at 1. However, DHA did not provide any explanation of the basis for the allocations and did not explain whether or how it intended any of the other documents provided in this exhibit to address this matter.

DHA also argues that the allegedly duplicative charges for "supplies" were instead "for copies of patient consent packets" made at Office Depot and that "[t]here were two charges because two employees handle in two batches." DHA Ex. 8, at 45. DHA submitted a bank credit card statement showing two Office Depot charges, for $49.11 and $40.45, made on the same day, but there is no source documentation showing what these charges were for. DHA Ex. 100, at 41.

DHA Exhibit 100 includes requisitions, bank credit card statements, and sales receipts that may relate somehow to the disallowed travel costs, but DHA provides no coherent explanation of how the documents show that any of these costs are allowable, notwithstanding the direction in the Board's Order to Develop Record to provide the documents it submitted to HRSA "together with any additional explanation necessary to show that each line item is allowable." Order at 4. DHA does not specifically contend that any other costs in this line item are allowable.[31] Accordingly, we uphold the disallowance with respect to this line item.

Lines 222 and 223
DHA charged to the DHI award for budget year 2010 direct costs totaling $26,129.96 and associated indirect costs totaling $19,597.48 for furniture for DHA's Ridgeland office (incorrectly identified in DHA Exhibit 31 as its Jackson office). HRSA disallowed the costs on the ground they were not included in the approved budget. DHA Ex. 31. DHA argues that the furniture purchases are allowable because it is "allowed to utilize the 25% rebudget rule to pay for these items." DHA Ex. 31; see also DHA ex. 8, at 46. The GPS permits rebudgeting among direct cost categories without prior approval if the cumulative transfers do not exceed 25% of the total approved budget. GPS at II-49, II-55. The Board's Order to Develop Record ordered DHA to "provide documentation showing the cost categories and amounts involved" for rebudgeting. Order at 4. DHA's response to the Order refers to DHA Exhibit 101, which contains an excerpt from an unidentified document showing that $4,500 was budgeted for "Office Furniture for New Staff Dedicated to DHI Project" with a handwritten note stating "Spent more than the budget amount, but we used the 25% rule." DHA Ex. 101, at 1. However, we cannot determine from that document or any of the other documents in the exhibit that the total amount rebudgeted for this and other purposes constituted no more than 25% of the total approved budget. Accordingly, we uphold the disallowance with respect to this line item.

---

[31] DHA concedes that the costs of car washes and accounting software (totaling $213.45 direct and $160.09 associated indirect) included in this amount are unallowable. DHA Ex. 8, at 45.

34

Lines 263, 269, 297, 329, 330

DHA charged direct costs totaling $9,910.08 and associated indirect costs totaling $7,432.57 to the DHI award for budget year 2011 for payments to reimburse five DHA Board Members, one of whom was also DHA's CEO, for travel expenses. With the exception of line item 330, which consists of several costs that HRSA disallowed on various grounds, HRSA disallowed the costs on the ground that they were "[n]ot project related." DHI Ex. 31. DHA asserts that all line items were costs incurred for a trip to Washington, D.C. to meet with HRSA to discuss matters related to the DHI grant and "had nothing to do with other projects overseen by DHA." DHA Ex. 8, at 46. DHA further asserts that "[a]fter this meeting, [Mississippi] Senator Cochran's staff asked that the Board members stop by his office to provide him with an update on results from the meeting, which was done at no additional cost . . . ." *Id.*

DHA submitted an agenda for a trip to Washington, D.C. showing a meeting with HRSA on the morning of July 12 and meetings with congressional staff that afternoon and the next morning. DHA Ex. 102, at 27-30. However, the agenda describes the first meeting simply as "Meeting with HRSA," and the seven HRSA participants listed in the agenda include five outside the Office of Rural Health Policy, which awarded the DHI grant. In addition, DHA submitted no documentation showing what was discussed at the meeting. Furthermore, the three Expense Reimbursement forms DHA provided describe the purpose of the trip only as a meeting with congressional representatives, and two of those forms further identify that meeting as "regarding DHA funding." DHA Ex. 102, at 3, 35, 41 (emphasis added). Thus, the record does not establish that either the meeting with HRSA or the meetings with congressional representatives specifically involved the DHI grant. Moreover, the agenda shows that DHA Board Members stayed an extra day (after the HRSA meeting) to meet with congressional staff. Thus, contrary to what DHA asserts, it incurred additional costs to meet with congressional staff. Accordingly, we uphold the disallowance with respect to these line items.

Line 278

DHA charged direct costs of $1,205.18 and associated indirect costs of $867.73 to the DHA award for budget year 2011 for travel costs for D.M. HRSA disallowed the costs on the ground that the travel was described as "USDE Planning" and was charged to the DHI grant in error. DHA Ex. 31. DHA asserts that the trip was to Washington, D.C. to meet with HRSA to discuss DHI's Indianola Promise Community project (DHI "project #42"). *Id.*; *see also* DHA Ex. 8, at 46. DHA further asserts that "[o]ne of the many items discussed with HRSA was a plan to submit a proposal to USDE, but the travel itself was not to conduct USDE planning." DHA Ex. 8, at 46. According to DHA, the Expense Reimbursement form for the travel mistakenly identified the "Grant" as "USDE Planning – IPC." DHA Response to Order at 3, citing DHA Ex. 103, at 4, 10. However, the only trip to Washington, D.C. shown on the forms on the cited pages was in July 2011, which was in budget year 2012, and the costs claimed on the forms do not

correspond to the amounts disallowed for this line item. DHA Ex. 103, at 10. Moreover, DHA provided no documentation to support its assertion that the purpose of the trip was solely to discuss the Indianola Promise Community project and not for USDE Planning. Accordingly, we uphold the disallowance with respect to this line item.

Line 340
DHA charged direct costs of $278.17 and associated indirect costs of $200.28 to the DHI award for budget year 2011 for a laptop computer. HRSA disallowed the costs on the grounds that the laptop was purchased outside of the purchase order process and it was unable to determine if it was for personal or work use. DHA Ex. 31. The documentation submitted by DHA shows that the amount paid for the laptop was approved and paid as a travel expense and not specifically identified as a laptop purchase. DHA Exhibit 104, at 3-5. DHA also submitted a June 20, 2012 memorandum regarding an "audit question" that states that "to draw more attention and to collect p[ro]spective client[s'] names, addresses, phone numbers and emails" at "an EHR booth at the MS Academy of Family Physician's Conference," it held a drawing for the laptop and gave it away. DHA Ex. 104, at 1. DHA did not provide any source documentation to establish that the laptop was actually used as a "giveaway" item or that this use was authorized. Accordingly, we uphold the disallowance with respect to this line item.

Line 456
DHA charged direct costs of $22,616 to the DHI award for budget year 2011 for nine laptops and printers. HRSA disallowed the costs on the ground that it could not determine the relationship to the grant. DHI Ex. 31. DHA asserts that "[t]hese items were included in the HRSA approved budget and work plan matrix." DHA Ex. 8, at 47. DHA submitted Equipment Requisition forms for both the laptops and printers showing "Early Childhood Institute" as the "Department" making the request. DHA Ex. 105, at 13, 17. DHA provides no explanation of how this documentation demonstrates that the items were related to the DHI grant. Accordingly, we uphold the disallowance with respect to this line item.

Line 460
DHA charged to the DHI award for budget year 2011 direct costs of $9,279.46 paid to Ruleville Community Development (RCD). HRSA disallowed the costs on the grounds that there were "no receipts for this invoice" and "[r]ent was not in the budget." DHI Ex. 31. DHA submitted documentation showing that it made an advance payment of $9,279.46 for June 2011 expenses to RCD for a "Delta Health Alliance Mini-Grant" titled "Youth for Community Pride Project." DHA Ex. 106, at 5-7. DHA also submitted a document titled "List of Receipts Ruleville Community Development Corporation 6/20/11" showing a total of $10,847.81 as well as source documentation for all "receipts"

listed.[32] DHA Ex. 106, at 24-43. A "Note" included with this documentation states that RCD "had $10,847.81 in invoices which we applied to the $9,279.46." *Id.* at 1. Since DHA provided source documentation for costs totaling $9,279.46, which did not include rent, we reverse the disallowance with respect to this line item.[33]

Line 481

DHA charged direct costs of $6,000 and associated indirect costs of $4,320 to the DHI award for budget year 2011 for leasing a copier for its Health Literacy Project. HRSA disallowed the costs on the ground that they were "not supported by actual lease invoice and not supported by method of allocation to Health Literacy Project." DHA Ex. 31. DHA submitted a June 28, 2010 invoice for $6,000 for "Copier Lease and Supplies for the year." DHA Ex. 107, at 5. The invoice, on DHA letterhead, is addressed to "Health Literacy...Delta Health Alliance" and states "Please remit to: Delta Health Alliance NON-GRANT account." *Id.* (full word capitalization in original). DHA also submits a document titled "DHI2 Posted General Ledger Transactions" that shows payments to Xerox Corporation totaling $5,937.58 made from indirect costs from February through June 2010. *Id.* at 3. A handwritten note on this document states, "Copier was no longer needed at Stoneville. It was transferred sometime in January 2010 to the Health Literacy program. Accounting Dept failed to make change until end of June. $6,000 was charged since move was unknown date in January." *Id.* DHA seems to be saying that it used non-grant funds to lease the copier from Xerox and then billed the Health Literacy Project, which was funded by the DHI grant, for the lease costs attributable to the period after it transferred the copier to the Health Literacy Project. However, even if the lease costs are allocable to the DHI grant, DHA failed to provide source documentation, such as invoices from Xerox, for the amounts posted to its general ledger as payments to Xerox. In addition, DHA acknowledges that the amount it billed to the Health Literacy Project that exceeds the total posted to its general ledger was based only on an estimate of the length of time the copier was used by the Health Literacy Project in January. Accordingly, we uphold the disallowance with respect to this line item.

---

[32] DHA provided source documentation for two tax payments that shows the payments were for the "tax period" "June /2011," not for the April and May taxes it listed. DHA Ex. 106, at 24, 29-30. Although DHA does not explain the discrepancy, we accept the documentation since it corresponds to the amounts on the list.

[33] We do not consider whether the individual costs for which the payments were made were allowable types of costs allocable to the DHI grant since DHA disallowed the costs only on the ground that they were undocumented.

Line 483

DHA charged direct costs of $1,489.44 and associated indirect costs of $1,072.40 to the
DHI award for budget year 2011 for four laptop computers. HRSA disallowed the costs
on the ground that there was no information about "who the computers are for and what
project they are for." DHI Ex. 31. DHA asserts that the computers were for "the Home
Visit project and allowed for research to be done in those visits." *Id.* In addition, a June
25, 2012 memorandum to "HRSA Auditors" states, "The home visitors implemented a
multimedia breastfeeding, infant nutrition and parenting lessons to moms enrolled in the
StartSmart program. Several DVD[]s were used as a means to educate these
participants." DHA Ex. 108, at 1. DHA provided no source documentation to support
these assertions and thus failed to establish that these costs are allowable. Accordingly,
we uphold the disallowance with respect to this line item.

In summary, we reverse the disallowance of direct costs totaling $11,604 and associated
indirect costs of $269.64 and uphold the remaining disallowance with respect to cost
category T.

### V. Costs to Maintain Cabins[34]

DHA charged to the DHI award for budget year 2010-2012 direct costs totaling $6,530
and associated indirect costs totaling $4,740.30 for the cost of maintaining cabins owned
by DHA and occupied by DHA employees while on travel. HRSA disallowed the costs
on the grounds that HRSA had already provided funding to DHA to maintain the cabins
and that the costs were not allocable to the DHI grant. HRSA Br. at 20.

DHA disputes that HRSA provided funding for maintenance of the cabins, asserting that
DHA instead provided funding to purchase the cabins. DHA Reply Br. at 16. DHA also
states that it calculated the amount at issue based on the federal per diem for a hotel in the
area, $70, because "DHA employees used these four cabins as a temporary residence,
instead of hotel rooms," while on travel and that the per diem amounts were reasonably
used to cover "regular maintenance and utilities costs for the cabins[.]" *Id.*

DHA's arguments do not address whether the costs at issue are allocable to the DHI
grant. DHA does not allege, much less show, that the per diem costs were solely for
travel by DHA employees working on the DHI grant. We note that DHA's May 2013
response to the Incurred Cost Review states that DHA's "finance department developed a
reimbursement procedure which would be used to allocate the cost of maintenance to the
various grants that DHA staff were working on during their stay." DHA Ex. 8, at 48.

---

[34] DHA's brief notes that cost category U is "Intentionally Left Blank." DHA Br. at 27.

38

However, there is no indication that DHA provided documentation of that reimbursement procedure with its response, nor did DHA purport to provide any such documentation in its exhibits on appeal. Since DHA failed to meet its burden of documenting that the costs at issue are allocable to the DHI grant, we need not reach the issue of whether HRSA already provided funding for cabin maintenance, as HRSA asserts.

Accordingly, we uphold the disallowance with respect to this cost category.

## MISC[35]

DHA charged to the DHI award for budget years 2010-2012 direct costs totaling $150,760.70 and associated indirect costs totaling $104,497.76 for numerous miscellaneous line item costs. DHA concedes that the expenditures in line items 64, 76, and 93, totaling $11,741.33, are unallowable and must be reimbursed.[36] DHA Br. at 5; DHA Reply Br. at 18. Of the $139,019.37 remaining in dispute, DHA argues that only $121,604.41 charged for legal fees on lines 82-84 and 465-467 is allowable. DHA Reply Br. at 17; DHA Reply to HRSA Response to Order at 2. Since DHA makes no argument regarding the remaining $17,414.96 ($139,019.37 minus $121,604.41), we therefore conclude without further discussion that $17,414.96 in addition to the $11,741.33 expressly conceded by DHA is unallowable.[37]

HRSA disallowed the legal fees on lines 82-84 and line 466 on the ground that "legal fees relating to the [J.H.] claim are not allowable."[38] DHA Ex. 31. HRSA disallowed the legal fees on line 465 on the ground that it could not determine if they were grant-related. *Id.* HRSA disallowed the legal fees on line 467 on the ground that it could not determine if the "allocation to grant is accurate" since "the descriptions of services provided reveal more indirect services provided" and on the ground that travel to meet with the Board was not allowable as a direct charge. *Id.*

DHA initially acknowledged that none of the legal fees should have been charged as direct costs of the DHI grant, but argued that the legal fees should have been included in calculating DHA's indirect cost rate and reimbursed as indirect costs. DHA Reply Br. at 17; DHA Response to Order at 5. DHA later argued that the legal fees are allowable as direct costs under 2 C.F.R. Part 230, Appendix B, ¶ 37, which provides in part that

---

[35] The parties did not identify this cost category by letter.

[36] DHA incorrectly identified the total direct costs for these three line items as $11,861.

[37] The $17,414.96 includes direct costs totaling $1,723.48 on lines 88 and 94 which are shown as legal fees but were paid to providers other than the law firm to which the disputed legal fees were paid. DHI Ex. 31.

[38] This is not the same individual described in cost category I (J.H. Travel).

"[c]osts of professional and consultant services rendered by persons who are members of a particular profession or possess a special skill, and who are not officers or employees of the non-profit organization, are allowable...when reasonable in relation to the services rendered[.]" DHA Response to Order at 4-5; DHA Reply to HRSA Response to Order at 2. HRSA does not dispute that this provision would apply to legal fees. [39]

The legal fees were billed by a law firm for services rendered from April through September 2010. DHA billed 75% of each invoice amount directly to the DHI grant. *See, e.g.*, DHA Ex. 48, at 2 (unnumbered). Based on the "Description of Services" entries on the bills, DHA states that the legal services rendered during April, May and June "primarily consisted of collecting facts..., researching and analyzing law, and advising DHA...over the course of the internal investigation following DHA employee [J.H.]'s accusation that DHI funds had been spent improperly." DHA Response to Order at 4, citing DHA Exs. 48-49, 53 (corresponding to line items 82, 83 and 467).[40] DHA continues: "Ultimately, the allegations proved unfounded, and [J.H.]'s employment was terminated. Shortly thereafter, [J.H.] filed a wrongful termination lawsuit, which was defended by [the law firm], as evidenced by" the July, August and September bills. *Id.*, citing DHA Exs. 50-52 (corresponding to line items 84, 465 and 466). DHA also states that all but one of the line items at issue here included other legal services: "review of services contracts with Delta Council" and "meetings, correspondence, contract negotiation and review, and legal research relating to the EHR project[.]" *Id.* n.3, citing DHA Exs. 49-53.

We conclude that none of the legal fees relating to J.H. are allowable as direct costs of the DHI grant. The complaint filed by J.H. in his wrongful termination lawsuit alleges that DHA "is funded by the taxpayers of the United States for the purpose of providing healthcare services to poor persons" and that "Plaintiff became concerned that the Defendant's Chief Executive Officer...was misusing substantial amounts of these

---

[39] Paragraph 37 further states that legal and related services are limited under paragraph 10 of Appendix B. Paragraph 10 provides in relevant part that legal costs "incurred in connection with any criminal, civil or administrative proceeding...commenced by the Federal Government, or a State, local or foreign government" are unallowable if the proceeding results in liability for the grant recipient. DHA asserts without contradiction that there was no such proceeding here. *Id.*; *see also* DHA Reply Br. at 17 n.10.

[40] The invoice amount in DHA Exhibit 48 is $4,932.22 but the amount on line 82 of the spreadsheet at DHA Exhibit 31 is $4,392.22. It appears that the numbers on the spreadsheet were transposed and that the amount at issue is actually $4,932.22. However, since neither party identified an error in the spreadsheet amount, we rely on that amount. HRSA is not precluded from the correcting the disallowance amount if it determines that there is in fact an error.

taxpayer funds." DHA Ex. 109, at 1-2. The complaint further alleges that J.H. reported to a member of Defendant's Board of Directors and then to the Board Chairman that DHA's Chief Executive Officer had diverted "funds of the taxpayers of the United States" for her personal use or benefit. *Id.* at 2. Notably, J.H. does not allege that he reported that the Chief Executive Officer misused DHI funds. DHA nevertheless argues that "[a]s DHI was DHA's primary source of funding during this period, it was DHI funds that "[J.H.] alleged had been misused." DHA Response to Order at 5. Accordingly, DHA takes the position that all of the legal fees at issue relating to J.H. are allocable to the DHI grant. *Id.* However, as DHA acknowledges (and we have noted above), the DHI grant was not DHA's only source of funding during the period. Thus, the funds that were allegedly diverted were not necessarily DHI funds, and, therefore, none of the legal fees relating to J.H. are allowable as direct charges to the DHI grant.[41]

DHA nevertheless takes the position that if the legal fees are not allowable as direct costs, they should be used to calculate DHA's indirect cost rate.[42] We agree that legal fees related to DHA's internal investigation of J.H.'s allegations of misuse of federal funds could properly be reimbursed through DHA's indirect cost rate (although as indicated below, it is unclear whether this is possible now). These legal fees benefitted all of the federally-funded programs operated by DHA because the investigation was conducted to determine whether federal funds were being used for the purposes for which they were awarded. However, DHA's defense of its termination action involved only DHA's liability as an employer, even if that action was based on what DHA determined to be J.H.'s false allegations of misuse of federal funds. Since the termination action served no grant purpose, the legal fees related to this matter were not allowable as either direct or indirect costs.

Furthermore, as already noted, DHA takes the position that legal services not related to J.H., specifically, "review of services contracts with Delta Council" and "meetings, correspondence, contract negotiation and review, and legal research relating to the EHR project legal fees," are allocable solely to the DHI grant and thus are allowable as direct costs. DHA Response to Order at 4 n.3, citing DHA Exs. 49-53. The legal services

---

[41] DHA asserts that the "legal fees at issue were determined at the time by DHA's Vice President of Finance and Administration...to be 75% directly allocable to the DHI Grant and 25% indirect expenses." DHA Response to Order at 5, citing DHA Ex. 48, at 9 (5/21/10 e-mail from Vice President of Finance and Administration). However, the e-mail merely states that "this formula is an estimate" based on "the tenor of ...questions posed to me" by the Board Chair and an attorney. *Id.* This is not a sufficient basis for finding that 75% of the invoiced amount was properly charged as direct costs of the DHI grant.

[42] The Board's Order to Show Cause asked the parties to "address whether a remand would be appropriate if the Board were to conclude that any legal fees could properly have been charged as indirect costs." Order at 4. In response, HRSA stated: "It is HRSA's position that, assuming they are otherwise proper, legal fees are direct costs. However, in the event the [Board] concludes otherwise, HRSA has no objection to remand." HRSA response to Order at 1 (unnumbered). HRSA did not explain what it meant by the caveat "assuming they are otherwise proper."

described in the invoices in the cited exhibits appear to include references to such services. However, DHA does not specifically identify these services or the amount of each line item that was billed for these services. Accordingly, even if we were to find that legal fees for such services would be allocable solely to the DHI grant, DHA has not provided adequate documentation to support reversing part of the disallowance on this basis.[43]

Accordingly, we uphold the disallowance with respect to this cost category. However, as discussed above, we conclude that DHA could have properly included the legal fees related to its internal investigation of J.H.'s allegations of misuse of federal funds in calculating its indirect cost rate. The Board's Order to Develop Record stated that "whether DHA is entitled to renegotiation of the indirect cost rate that applied to the period in question based on the omission of any allowable legal fees from the indirect cost pool may depend on the terms of DHA's indirect cost rate agreement and require input from the Division of Cost Allocation." Order at 4, citing *Piedmont Cmty. Actions, Inc.*, DAB No. 2595, at 13 (2014).[44] Both parties agreed that a remand would be appropriate here to the extent the Board determines that the legal fees would be allowable as indirect costs. HRSA response to Order at 1; DHA Reply to HRSA Response to Order at 2; *see also* DHA Reply Br. at 17. Accordingly, we remand this matter to HRSA to obtain input from the Division of Cost Allocation regarding whether DHA's indirect cost rate agreement for the relevant periods should be reopened and recalculated to take into account the legal fees related to DHA's internal investigation of J.H.'s allegations of misuse of federal funds. HRSA may require DHA to provide any information the Division of Allocation determines is necessary for this purpose.

---

[43] As noted earlier, one of the projects for which DHA used DHI funds was the Electronic Health Records (EHR) project. DHA indicates that DHI funds were also used to reimburse the Delta Council for the Drug Abuse Resistance Education project. DHA Response to Order at 4 n.3., citing DHA Ex. 45. The invoices also appear to refer to other matters unrelated to J.H.

[44] As was the case in *Piedmont*, DHA's indirect cost rate agreement provided that if the information provided by the organization which was used to establish the rate was materially incomplete or inaccurate, the rate would be subject to renegotiation at the discretion of the federal government. DHA Ex. 110, at 8.

**Conclusion**

For the foregoing reasons, of the total amount of direct and indirect costs disallowed by HRSA, we reverse $23,551.23 and uphold $1,065,500.77, including the amount DHA concedes is unallowable. In addition, as explained above, we remand the case to HRSA to obtain input from the Division Cost Allocation regarding certain legal fees that we conclude are not properly charged as direct costs.

_____

Stephen M. Godek

_____

Leslie A. Sussan

_____

Sheila Ann Hegy